State of Vermont v. R. J. Reynolds Tobacco Co., No. S1087-05 CnC (Pearson, J., June 3, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

| | |
|---|---|
| VERMONT SUPERIOR COURT | CIVIL DIVISION |
| CHITTENDEN UNIT | DOCKET NO. S1087-05 CnC |

STATE OF VERMONT

      v.

R. J. REYNOLDS TOBACCO CO.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## RE: CIVIL PENALTY AND INJUNCTIVE RELIEF

It has been more than 4 years since the court completed the evidentiary hearings in this case to determine the liability of Defendant R. J. Reynolds Tobacco Co. ("RJRT" or "Reynolds") under the Vermont Consumer Fraud Act ("CFA") – and the 1998 Master Settlement Agreement ("MSA") and related Consent Decree between the State of Vermont and Reynolds (and other national tobacco companies), *see State v. Philip Morris, Inc., et al.,* Dkt. #s S744-97 CnC; S816-98 CnC (entered December 14, 1998) – with regard to Defendant's advertising and marketing, initially commencing more than 10 years ago, of its non-traditional Eclipse cigarette.

More than 3 years have passed since the court issued its liability decision (with findings of fact and conclusions of law) concluding that Reynolds had indeed violated the Vermont CFA, MSA, and Consent Decree in at least three significant respects. *See State of Vermont v. R. J. Reynolds Tobacco Co.*, Dkt. # S1087-05 CnC (March 10, 2010) (available at http://www.vermontjudiciary.org/20062010%20TCdecisioncvl/2010-3-10-1.pdf ).[1] The parties then engaged in extensive, and extended settlement discussions over any civil penalties to be assessed under the CFA and/or for violation of the MSA and Consent Decree, and the State's considerable claim for recovery of its attorney's fees and other litigation expenses. There were also additional discovery issues which then had to be decided by the court on both fronts.

The parties were unable to resolve the remainder of the case, and eventually they were ready to proceed to this "Phase II" wherein the court would determine the civil penalties to be assessed against Reynolds, as well as the scope of any injunctive relief to be awarded to the State and imposed on Reynolds with respect to future marketing and advertising. To that end, the parties filed their respective legal memoranda on the State's claims for civil penalties and injunctive relief, and finally the court held its hearing on those issues on March 4, 2013. The parties stipulated to admission of various additional documentary exhibits, but no further testimony or other evidence was

---

[1] That liability decision should be viewed in light of the court's subsequent decision (filed December 2010) on Reynolds' motion to modify or alter certain findings of fact. Findings # 37, 54, 92 and 106, and the attendant footnotes, were slightly revised as stated in the December 2010 order, but those revisions did not change the court's ultimate conclusions as to Defendant's liability under the CFA and Consent Decree.

presented by either party. Lead counsel for both the State and for Reynolds then closed with impressive, and quite helpful argument in support of their respective positions on the nature, scope and extent of any civil penalties and injunctive relief to be awarded.

## I. Additional Findings of Fact Re: Civil Penalty and Injunction

1. Although the court will not repeat here all of the findings and/or conclusions from the previous liability decision which are pertinent to the determination of the remedies to be granted to the State, several do bear re-emphasis:

193. The public portion of the Eclipse website repeated the advertising slogan that "The best choice for smokers worried about their health is to quit – the next best choice is to switch to Eclipse." At one time, a version of the Eclipse website also repeated the phrase "Eclipse – A better way to smoke," which was also found in some printed ads and other marketing materials.[2] The marketing executive(s) who testified for RJRT in this action denied that they were making any claims that Eclipse was a "safer" cigarette,[3] but these statements essentially carried that essential message, and were understood by consumers to make that point . . . .

194. The generally available Eclipse website (from 2003 through 2007) also included the following statements:

[E]xtensive scientific studies show that, compared to other cigarettes [Eclipse]

✓ May present less risk of cancer associated with smoking

Because Eclipse primarily heats rather than burns tobacco, its smoke chemistry is fundamentally different, and the toxicity of its smoke is dramatically reduced compared to other cigarettes.

For example, studies* with smokers who switched to Eclipse from their usual brand showed that Eclipse produced:

---

2 [Previously footnote 137] The "better way to smoke" statement was perhaps most prominent in the Eclipse "on-sert" which came with each Eclipse pack, between the cellophane wrapper and the rest of the packaging. It is stipulated that these "on-serts" were included with Eclipse packs sold in Vermont. The "on-sert" repeated the basic health claim set forth many times above:

**SCIENTIFIC STUDIES SHOW THAT, COMPARED TO OTHER CIGARETTES, ECLIPSE**

- May present less risk of cancer, chronic bronchitis, and possibly emphysema

3 [Previously footnote 138] Reynolds did not claim that Eclipse is a "safe" cigarette, and all of its ads and other marketing materials were always careful to include such a disclaimer. The State does not contend otherwise.

- ✓ 17-57% less lung inflammation (after two months in smokers of two packs or more per day)
- ✓ 70% lower smoking-related mutagenicity (DNA changes)**

*These studies did not include smokers of cigarettes with less than 4 mg "tar" by FTC Method.

**As measured in an *in vitro* laboratory test that can be used to detect chemical mutagens that potentially result from smoking.

These website statements, and advertising claims were available to Vermont consumers, and were in fact made to, and received by at least some Vermont consumers, given the purchase of at least 30 cartons of Eclipse off the website.

\*        \*        \*        \*

208. From 2000 through 2007, nationwide sales of the Eclipse cigarette totaled approximately 1.2 million cartons (in excess of 240 million Eclipse cigarettes), for gross revenue amounts of around $34 million to Reynolds (about 14 cents per cigarette, or $2.83 a pack). During that same period (2000 through 2007), the total sales of Eclipse in Vermont were approximately 410 cartons, or about $12,000 in gross sales. Active sales of Eclipse in Vermont, through normal sales and distribution channels, apparently ceased as of early 2008 (this point is somewhat unclear), but there were sales in Vermont, and solicitation of sales in Vermont using the challenged marketing statements and affirmative health benefit claims prior to, and at the time the complaint herein was filed in July 2005, and continuing for at least 2+ years thereafter.

209. From 2000 (when Reynolds first began making the affirmative health benefit claims for Eclipse) through 2004 (when the "Scott ad" was withdrawn), Reynolds spent at least $16.656 million nationwide for print and other Eclipse advertising, signage, and promotional and marketing efforts.

2. Based on its findings and other analysis of the evidence presented during the plenary trial on liability, and the court's understanding of the applicable and controlling law, the court concluded – *see* Conclusions of Law, Parts (A)(3)(i-iii), at pgs. 100-102 – that three (3) significant, and substantial statements in the marketing and advertising materials employed by Reynolds for its Eclipse cigarette violated Vermont law under the CFA, and the proscriptions set forth as well in the MSA and Consent Decree:

(i) Turning first to one of the key statements made on the Eclipse website from 2003 through 2007, which site was accessible to Vermonters, and actually used or accessed by at least a few State residents (given the purchase of some 30 cartons of Eclipse off the website), there can be little dispute that an express "establishment claim" was made: "extensive studies show that, compared to other cigarettes, [Eclipse] [m]ay present less risk of cancer associated with cancer." The consumer perception studies conducted by Reynolds itself prior to

3

making any affirmative health benefit claims; the consumer surveys conducted by the State's experts for this litigation; and RJRT's concession here, all establish that the overall impression, and essential meaning derived by consumers from that type of statement would be that, in fact, switching to Eclipse would reduce any given smoker's chance of developing cancer. However, not only did Reynolds not have the "extensive studies" it expressly touted to back up that statement,[4] it actually had no such studies at all, because the clear consensus of the entire medical and scientific community familiar with tobacco-related diseases, is that any such statement making a quantitative risk comparison between different cigarettes would require, and can only be based on long-term data of comparative human disease incidence derived from human epidemiological studies. That website statement concerning Eclipse was thus material, misleading and deceptive as a matter of law, and the State of Vermont is entitled to judgment in its favor against Defendant Reynolds, under 9 V.S.A. § 2453(a).

(ii) The other statement on the Eclipse website principally challenged by the State, was that "studies with smokers who switched to Eclipse . . . showed that Eclipse produced … 70% lower smoking-related mutagenicity (DNA changes)." In context, and together with the large visual graph next to this statement, this representation is perhaps closer on the continuum to an implied rather than express "establishment claim." But the essential message implied, from the text and surrounding circumstances alone, and then reasonably understood by the typical consumer (i.e., smoker), is that mutagenicity <u>in human DNA</u> would be reduced by 70%.

However, Reynolds had (and still has) no medical or scientific studies to prove that particular assertion. Moreover, even though the statement was twice footnoted, RJRT did not use either opportunity to explain to consumers that its evidence related only to salmonella bacteria mutagenicity, not humans; that the tests referred to were, at best, preliminary "screening" assessments which should primarily be used only to isolate, and identify smoke compounds for further intensive study; and that the tests it did have, and referred to here, meant that its more general statement above (i.e., "less risk of cancer") did not apply at all to any smokers whose usual brand was an "ultra-light" cigarette with less than 4 mg

---

4 [Previously footnote 149] To be sure, Reynolds did have "extensive" preliminary studies, well over several million dollars worth, which consistently tended to demonstrate reduced exposure to many harmful tobacco smoke constituents, and some reductions in some of the harmful toxicological effects (e.g., indicia of lung inflammation) which are thought to be associated with, or possibly even precursors to tobacco-related diseases. To that extent, then, those studies generally met one of the subsidiary standards under [the] law, i.e., that any such tests or studies be "conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." *National Urological Group,* [citation *infra*] at *13. But, as the court has found, the many tests and studies on Eclipse done by Reynolds (and its outside researchers), no matter how valid and accurate they might otherwise be, are ultimately not the kind of "extensive studies" which are needed to claim they actually "show that … [Eclipse] present[s] less risk of cancer."

4

of "tar."[5] This second website statement concerning Eclipse was also material, misleading and deceptive as a matter of law, and the State of Vermont is entitled to judgment in its favor against Defendant Reynolds, under 9 V.S.A. § 2453(a).

(iii) Turning now to the principal advertising statement challenged here, in the so-called "Scott" print ad, *see* above – Eclipse is "[a] cigarette that may present less risk of cancer, chronic bronchitis, and possibly emphysema" – the extrinsic evidence presented by the State, and Reynolds' concession, indisputably establish the actual message communicated to, and reasonably understood by the intended, or targeted consumer (i.e., a current smoker of any brand of conventional tobacco-burning cigarette): any smoker switching to Eclipse, including any current "light" or even "ultra-light" smoker, will in fact (not "may" or "might" or "could") experience a lesser chance, or statistical incidence of developing one (or all) of those tobacco-related diseases.  Reynolds knew that consumers would understand that message, and deliberately made the "Scott ad" statement with the intent that smokers would understand, and believe there was an affirmative health benefit from smoking Eclipse, i.e., that switching to Eclipse would improve their chances of not developing cancer, chronic bronchitis, or possibly emphysema.

This is an implied establishment claim, because its "scientific aura" clearly implies that it is established, or supported by scientific or medical studies.  As such, Reynolds must have had in hand the necessary scientific and medical evidence which would convince the applicable medical and scientific community that the claim was in fact true, and that it was in fact supported by that data, and those studies deemed sufficient by the relevant community of experts. The State has proven by a clear preponderance of the record evidence here, that only long-term epidemiological studies will support any such statement, or claim as to any quantitative, and comparative reduction in human disease incidence related to smoking cigarettes, and Reynolds concedes it has no such evidence, or data, or studies.  This principal advertising statement in the "Scott ads" concerning Eclipse was thus material, misleading and deceptive as a matter of law, and the State of Vermont is entitled to judgment in its favor against Defendant Reynolds, under 9 V.S.A. § 2453(a).

3. As noted in the March 2010 liability decision, Reynolds eventually stipulated at trial that at least some magazines or other publications, containing the so-called "Scott ad" (or some other non-material variant thereof) with the principal offending marketing statement set forth immediately above, were sent to and actually received in Vermont. The primary dispute now is over how many of those magazines or publications – not the actual quantity or number of individual magazines, but whether at least one exemplar of

---

[5] [previously footnote 150] Reynolds did accurately disclose the literal truth, and the 4 mg "tar" limitation in the study, in footnote *. But that disclosure would have no meaning to the average reasonable consumer, who would more likely than not understand those mutagenicity tests, even with the stated limitation, to nonetheless be part of the "extensive studies" cited for the overall "less risk of cancer" statement earlier in the website page .

each edition of a magazine or publication containing a Reynolds' ad for Eclipse – were sent into this state and thus more likely than not "received by" and capable of being seen by Vermont consumers.[6] The other means by which the offending marketing statements concerning Eclipse were made to Vermont consumers are not, however, generally challenged at this stage.

4. It is not disputed, indeed it is stipulated by Reynolds that the Eclipse website was accessible by, and available to Vermont consumers from July 2003 through the end of 2007, approximately 4 and ½ years, or 1642 days. Approximately ½ of that period occurred after the State had filed this action in late 2005.

5. As discussed previously, every pack of Eclipse cigarettes contained a printed "on-sert"[7] which contained most of the pertinent marketing language previously discussed, from both the Eclipse website and/or the "Scott ad" (or some iteration thereof), including the following: "SCIENTIFIC STUDIES SHOW THAT, COMPARED TO OTHER CIGARETTES, ECLIPSE: May present less risk of cancer, chronic bronchitis, and possibly emphysema". *See* VT Exhibit 1075 (Bates # 53410-4818). It is not disputed, indeed it is stipulated by Reynolds that 410 cartons of the Eclipse cigarette, each with 10 packs of the cigarettes, were sold in Vermont. Thus, a total of 4100 offending on-serts were sent into Vermont by RJRT and were available within the state to Vermont consumers.

6. Reynolds also marketed the Eclipse cigarette with, and through various types of direct mailings to potential buyers, utilizing leads, or mailing lists developed through multiple sources. *Cf.* Findings of Fact, ¶ 191 & fn. 136. These direct mailings often contained discount coupons for Eclipse, and promotional materials which made, *inter alia*, the following statement: "Discover the Eclipse Difference. May present less risk of cancer, chronic bronchitis and possibly emphysema." *See* VT Exhibit 3034 (Bates # 52500-0167); VT Exhibits 518, 520. It is not disputed, indeed it is now stipulated by Reynolds that 1028 pieces of these types of direct mail marketing for Eclipse were sent into Vermont, to potential Vermont consumers. There were 102 such direct mailings (in March and June 2006) after the State had already commenced this action asserting that the Eclipse marketing statements were in violation of the MSA and Consent Decree and the Vermont CFA, and 354 mailings in April and 2 in November 2005 after the National Association of Attorneys General had first served notice on Reynolds, in late March 2005, *see infra* ¶ 12, that it had 10 days to "cease and desist" its offending marketing statements concerning the Eclipse cigarette.

7. Even apart from the dispute over magazine and/or newspaper mailings into Vermont with Eclipse ads, these first three types of marketing for and promotion of

---

[6] RJRT has previously challenged this phraseology of "received by" in its motion to alter the court's liability findings. Again, "receipt" is used here in a generic sense in that the materials were in and around and available within the state, and not to connote actual comprehension of or reliance by any particular, or discrete Vermont consumer, which is simply unknowable at this point.

[7] Apparently, it is an "on-sert" because it was literally placed on the outside of the paper container with the cigarettes, but inside of and under the cellophane wrapper that enclosed the package.

Eclipse which were clearly made to, and/or available to Vermont consumers – i.e., the website, the direct mailings, and the package on-serts – would total 6770 separate instances in which the deceptive and scientifically unsubstantiated statements concerning Eclipse were made or available to Vermont consumers, and thus entered Vermont. Taking just the direct mailings and Eclipse on-serts, where there is no real dispute in either instance as to the number of separate offending statements directly made to consumers in Vermont, there would be a total of 5128 violations.

8. The State has identified 22 different exemplars of nationally published and distributed magazines or newspapers (i.e., *USA Today* or the "Parade" newspaper magazine insert) which contained the "Scott ad" (or other similar variations thereof), and were used by Reynolds during, and as part of its national marketing and promotion campaign for the Eclipse cigarette which RJRT "rolled out" beginning in 2003. *Cf.* Findings of Fact, ¶ 190 & fn. 134. Of those 22 examples, it is not disputed, indeed it is stipulated by Reynolds that at least 6 of those magazine editions were received within Vermont.[8] Of the remaining 16 editions, or issues of these identified exemplars – they are <u>not</u> the entire universe of national publications used by Reynolds for the Eclipse campaign, *see infra*, but simply representative – Reynolds does not dispute that "Scott ads" (or other similar promotional materials) were scheduled to be included in these publications. Rather, RJRT contends that the State has failed to prove that <u>a</u> version or edition of the subject publication, with the offending statement(s) concerning Eclipse, was actually sent into, available, or received within this state.

9. As part of its national marketing campaign for Eclipse, Reynolds intended, and sought to take advantage of lower costs by inserting ads for Eclipse in so-called "regional editions" of national publications, where otherwise unused space might be available at a discount because there were fewer regional advertisers in, say, the southeastern edition of *Popular Mechanics* for that particular week compared to the northeastern edition of the same magazine. Accordingly, even though the national marketing plan did reference generally the additional 16 publications cited by the State, and Reynolds has previously identified these exemplars as exactly that – i.e., examples of the national ads utilized to promote Eclipse, and the publications they appeared in – those facts alone do not establish, by a preponderance of the record evidence, that <u>a</u> version or edition of the subject publication, with the offending ad(s) and statement(s) concerning Eclipse, was actually sent into, available, or received within this state. *See also* ¶s 14 – 18 *infra*.

10. The remaining 16 print media exemplars which Reynolds disputes, and which the State contends should be "presumed" to have entered Vermont as part of the national publication and distribution of these magazines or newspapers, are as follows: *Better Homes & Gardens* (Sept. 2003); *Newsweek* (Dec. 29, 2003); *Parade* (Sept. 7, 2003); P*eople* (June 14, 2004); *Popular Mechanics* (Aug. 2003 & Nov. 2004); *The Sporting News* (Dec. 29, 2003; July 12, 2004; Aug. 23, 2004; Sept. 6, 2004); *USA*

---

[8] The 6 agreed-on print exemplars are two issues of *Time* magazine (*see* VT Exhibit 2097), from late December 2003 and May 2004, and four issues of *Popular Science*, in August 2003, and February, May and July of 2004. All six of these exemplars were found in the microfiche records at the Bailey-Howe Library at UVM.

*Today Weekend* insert (Apr. 30, 2004; July 3, 2003; Oct. 31, 2003); and *USA Today* (Sept. 9, 2003; Dec. 29, 2003; Dec. 30, 2003).[9]

11. Neither party actually presented any detailed evidence, one way or the other, on this issue of the so-called "regional editions" of these various magazines or nationally-published newspapers. *Cf.* Depo. of David Iauco (June 21, 2006), pgs. 253-54 (explaining general concept). Again, RJRT stands on its assertion that it is the State's burden of proof to establish the Eclipse ads and other marketing messages which actually did reach Vermont, in the form of the exemplars cited by the State. The State counters that it has established a "presumption" or reliable inference it was more likely than not that these 16 exemplars also entered Vermont, and that Reynolds, with its superior knowledge about its own marketing plans and how those efforts were in fact carried out, is in the best evidentiary position to rebut that inference and prove that the cited exemplars did not reach Vermont (i.e., because of so-called regional differences, or for some other reason).[10]

12. Even if the additional 16 national magazines or newspaper editions did not actually reach Vermont with the offending Eclipse marketing statements – and of course this court's choice of remedies, both civil penalties and injunctive relief, is limited solely to addressing public harm and those violations which have occurred within this state, affecting Vermont consumers – it is still useful to consider in some secondary respects the nationwide scope of the marketing plan utilized by Reynolds for Eclipse, and the nationwide implications of this action. Prior to the State of Vermont commencing this action under the Vermont CFA and its version of the nationwide MSA and this court's resulting Consent Decree, the National Association of Attorneys General ("NAAG") sent to Reynolds a letter and "Notice of Intent to Initiate Enforcement Proceedings" (dated March 28, 2005) under the MSA and each state's consent decree, as well as each state's respective consumer fraud statutes, specifically contesting the various health claims made by RJRT concerning Eclipse. *See* VT Exhibit 3035. The 3/28/05 letter was signed by the Attorneys General of 40 of the 50 states.

13. Only one state, Vermont, actually followed through on the intention to institute such enforcement proceedings. The Attorney General of Vermont, William

_____

[9] Reynolds concedes that these issues of *USA Today* were generally likely to be found in Vermont, e.g., for free at the front desk of the Hilton Hotel (or was it then still the Radisson?) in Burlington. Reynolds still disputes, however, that these copies of *USA Today* necessarily contained the "Scott ad" (or something like it) because of the so-called "regional editions".

[10] During the hiatus between the court's March 2010 liability decision and the March 2013 remedies hearing, the State attempted to convince the court to allow discovery to be re-opened to explore in detail these specific marketing issues. The court declined, for the various reasons stated, but primarily because it simply did not appear to be worth the time, expense and effort – after extensive evidentiary proceedings on liability had long since been concluded – to prove at best what amounts to 16 additional violations of the CFA and/or Consent Decree and MSA, *see infra*. Also, the State had been on notice, since taking the deposition of Reynolds' then chief marketing officer (David Iauco) in June 2006, that RJRT's advertising agency was likely to have such detailed records and information. *Id.*, pgs. 255-56. Moreover, the State was clearly a party to the March 2005 warning letter from the NAAG, and thus the State was aware at that point, or certainly should have been, that if it was going to file suit, it was high time to begin scouring the state for representative samples of offending Eclipse ads.

Sorrell, Esq., was the president of the NAAG at the time. However, numerous other state attorneys general, and/or their deputies or staff, were involved in preparing for and then assisting in the prosecution of this action – as can be seen from the extensive motion and discovery practice in this case concerning the up-coming "Phase III" litigation over the State's request for attorney's fees and expenses, where one of the principally contested issues is the recoverability of attorney's fees for those other states' attorneys essentially acting as 2nd (or 3rd or 4th) chair at depositions, etc. In opposing, for example, the State's requested discovery into the legal fees and expenses incurred by Reynolds itself in defending this action, RJRT has repeatedly urged that such comparisons were irrelevant, because it was compelled to defend, and litigate this action "to the hilt" because of the potential precedent and national implications, and possible business-related repercussions to Reynolds itself on a nationwide scale, even from an adverse Vermont-only judgment.

14. As discussed previously, Reynolds consciously, and deliberately chose to use the offending statements concerning Eclipse as part of its "national roll-out" of its non-traditional cigarette, in order to promote the cigarette and attempt to increase sales of the Eclipse, which until that point had at best been lackluster and did not meet the company's hopes and expectations. As later explained (at deposition in 2006) by Mr. Iauco, then in charge of the Eclipse marketing:

Q. Then what changed, if anything, either in terms of the distribution, media, or messages about Eclipse between spring 2001 and late spring/early summer 2003 when you began the national rollout?
A. We attempted several different approaches over that period of time to try to improve Eclipse's sales performance, you know, some retail pushes. We tried some different promotional activity. None of it seemed to really boost the brand and – change its trajectory in the market. So we were at a point of, more or less, saying, okay, this is – this represents pretty much what we can expect from this brand, so, you know, where do we go from here?
Q. And when was that threshold reached?
A. Early part of 2003.
                    *          *          *
Q. . . . . [W]hat happened next?
A. We decided that – obviously, we had the decision to make of whether or not to pull Eclipse from the market or leave it out there. And we had tried so many things and it – it really wasn't responding. So what we decided to do was that we wanted to try a plan where we could make it viable from a business standpoint, accepting its very low sales but make it, more or less, a break even or maybe slightly profitable.
    So we devised a – a plan to do just that on a national basis where we would run highly-efficient national media to attempt to draw smokers to a Web site where – where they would be – be provided with all the relevant information about Eclipse, including where to buy it; that we would attempt to concentrate our distribution in a few retail outlets that were conveniently located to smokers, the majority of smokers, and also easy to remember where to find it; and that –

and we take the brand national and make it available national that way, in the hopes that, again, we could generate enough business.

And, you know, our projections indicated that if we could get a sufficient number of smokers that way it wouldn't really take a whole lot to make it break even over a period of time and it would allow us to keep the brand, which we felt – I think there was – there was a lot of interest in maintaining the brand in the market, maintaining it – its availability and without losing a – continuing to lose a ton of money on it. And I – you know, was pretty – a novel plan, to say the least. It was very unusual.

*　　　*　　　*

Q. . . .[D]id you have in mind at the time what that number of smokers was sort of the – the break-even threshold?

A. What I recall was that we would need over a period of time approximately 50, 55,000 smokers, something like that . . . .

As noted previously, and repeatedly in the court's March 2010 liability decision and findings, an integral part of this "novel" and "very unusual" marketing plan for Eclipse was to feature prominently, and aggressively promote the perceived health benefits to existing smokers of switching to this non-traditional cigarette.

15. Accordingly, the 2003 and 2004 "Eclipse Final Media Plan"[11] both describe the following goals or "Objectives":

- Generate awareness of Eclipse among Adult 25-49 Low Tar/Ultra Low Tar Smokers
- Secondary target is Full Price Light Smokers 35+
- Encourage targeted smokers to visit the Eclipse website

The ad placements and selection of chosen media would be "based on the following criteria" which included "Editorial compatibility with the Eclipse proposition".

16. The 2003 Eclipse Media Plan, which was generally followed for the 2004 plan as well, described its ad placement strategy as follows:

Core publications & Incremental Buy (64% of Budget)
- Core Publications:
- High Composition/High Coverage of Smoker Target
- Mass circulation titles

---

[11] Both the 2003 and 2004 Eclipse Media Plans are fronted with an "Important Notice" stating that the California Superior Court on June 6, 2002 had found that RJRT had violated Section III(a) of the MSA by "target[ing] Youth . . . in the advertising, promotion or marketing of Tobacco Products," and had entered an injunction which had caused Reynolds to adopt fairly extensive 7-point "guidelines" which affected "all approved plans for advertising in national consumer magazines." It is unknown whether that particular California violation, and resulting injunction were affirmed on appeal. Nonetheless, Reynolds seems to have recognized early on in dealing with cases against it under the MSA that enforcement actions in a single state could, and would have national repercussions (at least if the tail (e.g., California) is big enough to wag the entire dog).

- National insertions scheduled
- Incremental Buy
- Due to time-frame of the buy, only weeklies and newspapers could be utilized
- 6 weeklies; all national except for some regional editions of Newsweek

Remnant publications: (36% of Budget)
- Mass and selective lifestyle titles

16. The "Core Titles" to be used for placement of Eclipse ads were defined as the "Sunday Magazines, *Parade* and *USA Weekend*"; and these "selective lifestyle titles" – "Men's Interest, *Playboy*, *Popular Mechanics*, *Popular Science*" and "Women's Interest, *Better Homes & Gardens*".  The "National Insertions" were defined to include "Sunday Supplements" and "*USA Today*". The actual amount(s) budgeted for this "Core Title" advertising is not detailed in the documents submitted to the court.

17. For 2003, the recommendation for the "Incremental Spending" ad placements was projected as follows:

|  |  |
|---|---|
| **Dailies** | |
| *USA Today* | $300.3 |
| | |
| **Weeklies** | |
| *Newsweek* | $176.2 |
| *People* | $121.1 |
| *In Touch* | $23.8 |
| *Sporting News* | $17.9 |
| *Time* | $76.5 |
| *TV Guide* | $83.4 |
| Total Weeklies | 499.0 |
| | |
| Total Spending | $799.2[12] |

The "Remnant Titles" to be utilized would include such publications as *This Old House*, *Budget Travel*, *Vanity Fair*, *Family Circle*, *Ladies Home Journal*, *Sports illustrated*, *Car & Driver*, *Bon Appetit*, and *Guns & Ammo*. The actual amount(s) budgeted for the "Remnant" advertising is also not detailed in the documents submitted to the court.

---

[12] Although not detailed in the documents themselves, or specifically explained at the March 2013 remedies hearing, it appears that these figures are expressed in $1000's. This would seem to be consistent with Reynolds' overall marketing and promotional expenditures on Eclipse, at $16.656 million just through 2004. *See* ¶ 1 above (repeating original Finding ¶ 209). Of course, as already found by the court, RJRT continued to market and sell Eclipse nationwide, and in Vermont, through at least 2007 – well after the filing of this action, and the Attorney Generals' warning letter in March 2005 – all the while attempting *inter alia* to "encourage targeted smokers to visit the Eclipse website" where offending health claims were still being made, even if the "Scott ad" itself had been discontinued by the end of 2004.

18. Accordingly, although certainly Reynolds did utilize a marketing strategy for Eclipse to take advantage of lower ad rates for "remnant" space and in "regional" versions of some publications, it is fairly evident that the overall plan itself devoted 2/3 of the ad budget to "core publications" with no obvious distinction for so-called "regional editions." The "incremental spending" budget alone, at almost $800,000 for just 2003, appears to have been defined as last-minute ad buys, in weekly or daily publications, but still with nationwide reach. Thus, one could certainly justify the conclusion it was more likely than not that the 16 issues of the disputed magazines cited by the State, *see* ¶ 10 above – i.e., national publications such as *Better Homes & Gardens*, *The Sporting News, Popular Mechanics*, and *USA Today* – <u>did</u> in fact reach Vermont and the offending Eclipse ads therein were published to Vermont consumers generally.

19. However, the court still ultimately finds that the State has not actually proven that those 16 other cited magazines with a "Scott ad" (or variant) reached consumers in this state, and therefore the court will not include those additional 16 publications as exemplar violations of the CFA and/or MSA and Consent Decree. In total, the State has therefore proven there were **6776 separate instances of Reynolds making unsubstantiated, and deceptive health marketing claims and statements about Eclipse** which reached, or were available to Vermont consumers, through 2007 – i.e., on the website (1642 days), the direct mailings (1028 pieces), the package on-serts (4100), and 6 national magazine or newspaper exemplars admittedly received in Vermont.

20. Defendant R. J. Reynolds Tobacco Co. is a wholly-owned subsidiary of its parent holding company Reynolds American Inc. ("RAI"). RJRT is the second-largest U.S. tobacco company; another subsidiary of RAI, American Snuff Co. LLC, is the nation's second-largest manufacturer of smokeless tobacco products. RJRT's market share of the U.S. cigarette industry in 2012 was 26.5%. RAI had total "Net Sales" (i.e., total net revenue) of $8.304 billion and $8.541 billion in 2012 and 2011, respectively. "For the full year 2012, <u>RJR Tobacco's adjusted operating income</u> was <u>$2.3 billion</u>, down 2.2 percent from" 2011 (emphasis added). <u>RAI's net income</u> for 2012 (reported according to GAAP) was <u>$1.272 billion</u>, down 9.5% from the prior year.[13]  These "declines were again driven by losses on [RJRT's] non-focus brands which receive little or no promotional support," which indicates the importance of marketing and promotion in the "competitive . . . cigarette category" where total U.S. cigarette shipments are declining year to year, i.e., "2.3% in 2012, to 286.5 billion cigarettes, 3.5% in 2011 and 3.8% in 2010."

21. "RAI's strategy is focused on transforming tobacco in anticipation of shifts in consumer preference to deliver sustainable earnings growth, strong cash flow and enhanced long-term shareholder value. This transformation strategy includes growing the core cigarette and moist-snuff businesses, focusing on innovation, including smoke-free tobacco, and exploring nicotine replacement treatments and other opportunities for

---

[13] This net income figure for the parent, or holding company RAI is <u>after</u> the payment into a reserve fund of Reynolds' expected share of the annual payment to the states under the MSA, *see* ¶ 25 & fn. 14, *infra*.

adult consumers while maintaining efficient and effective operations. RAI's strategy encourages the migration of adult smokers to smoke-free tobacco products, which we believe aligns consumer preferences for new alternatives to traditional tobacco products in view of societal pressures to reduce public smoking. RAI's operating companies facilitate this migration through innovation, including the development of *Camel* Snus, tobacco extract products, heat-not-burn cigarettes, tobacco vapor products and nicotine replacement therapy technologies." *See* RAI Form 10-K (filed 2/12/13 with the Securities & Exchange Commission, for period ending 12/31/12), pgs. 2-3. These "new milestones in innovation" and "transforming the tobacco industry" include development and promotion, and "significant investments to support expansion" of, for example, RJRT's "Vuse e-cigarette."

22. For the last 3 years, 2010-2012, RAI incurred total advertising, promotional and marketing expenses of $72 million, $65 million, and $72 million, respectively ($69.66 million average). For the last 3 years, 2010-2012, RAI incurred research and development costs of $62 million, $69 million, and $71 million, respectively ($67.33 million average).

23. RAI's 2012 Form 10-K has a Note 13 to its consolidated financial statements, which is 47 pages long and discusses in general, and in some specific instances in more detail, most if not all of the tobacco-related litigation that RAI (mostly RJRT) is involved in or which could potentially have a "material adverse effect" on its financial position. For example, in just the state of Florida alone, there are pending cases against RJRT – in whole or in part; RJRT may share liability with other tobacco companies, from 5% to 90% – with jury verdicts and/or court judgments, all in various stages on appeal or in post-judgment proceedings, in which a total of $125.8 million has already been awarded just in punitive damages alone. *See* Form 10-K, Note 13, pgs. 98-100. Notwithstanding these cases and other reported litigation, including this action, *see id*. pgs. 128-129, "[n]o liabilities for pending smoking and health litigation have been recorded in RAI's consolidated balance sheet as of December 31, 2012," *id*. pg. 92, because Reynolds believes it "is not probable" that the company will in fact ultimately suffer any material adverse impact to its overall financial position on account of any such litigation. In other words, involvement in extensive, and multiple litigation, in which possible judgments or awards in the range of several millions of dollars may be entered against RJRT in any individual case, now appears to be simply an inherent part of Reynolds' business model, and is treated as an unavoidable cost of doing business in the tobacco industry.

24. Reynolds has been involved for years in arbitrating claims made by all of the participating tobacco companies in the MSA, as to "adjustments" which should be made to the participating companies' scheduled payments to the various states under the MSA due to cigarette sales by smaller, independent tobacco companies who were not signatories to the MSA, i.e., non-participating manufacturers ("NPMs"). For each of 2011 and 2011, "RJR Tobacco's approximate share of disputed NPM Adjustment[s]" is $469 million each year, a total of $938 million for those 2 years alone. *See* Form 10-K, *id*., pg. 132. This indicates the size, and scope to Reynolds of just one aspect of disputed payments, for just 2 years, under the MSA.

25. The total of scheduled payments to the settling states under the MSA for 2012, and thereafter is $8.004 billion dollars annually – subject, of course, to "adjustment for changes in sales volume, inflation and other factors" as described in the MSA; each tobacco company's actual payment is then further "allocated among [them] on the basis of relative market share" which was 26.5% for RJRT in 2012. *Id.*, pg. 123. Vermont's share of the total to be paid each year, which does not adjust, is 0.4111851%, *see* Exhibit A to MSA. Accordingly, prior to any adjustments in the overall total to be paid out each year in accordance with the MSA, under this formula Vermont could apparently expect an annual payment from all of the settling tobacco companies of approximately $32,911,255.[14]

## II. Conclusions of Law

## (A) Counting the Number of CFA Violations

Reduced to its essence, Reynolds contends the court should recognize only a single violation of the Vermont Consumer Fraud Act, and of the MSA and Consent Decree, because its years-long marketing and sales campaign for the Eclipse cigarette was in its view a single uninterrupted effort to promote the offending "less risk" health claims concerning Eclipse. RJRT bolsters that contention by pointing to the meager sales of Eclipse in Vermont (i.e., only 410 cartons with approximately $12,000 in gross revenue), especially compared to the rest of the United States, inasmuch as Vermont consumers were not a major, or special focus of attention (unlike, for example, consumers in Texas or California, *see* "Eclipse 2003/2004Final Marketing Plan"). Adopting Reynolds' approach would make it liable for a maximum of up to $10,000 in civil monetary penalties, the maximum penalty allowable for any single violation. *See* 9 V.S.A. §§ 2458(b)(1), 2461(a).

The State, conversely, argues that each and every instance in which Reynolds made the offending health claims regarding Eclipse available within the state, so that Vermont consumers would have had access to or were potentially exposed to those statements the court has found to be deceptive and scientifically unsupported, should be counted as a separate violation of the CFA and MSA/Consent Decree, and subject to an award of civil penalties of up to $10,000 in each instance. And, to be clear, the State in this case is not seeking any "consumer restitution" or recovery of other actual harm suffered by discretely identifiable consumers, *cf.* 9 V.S.A. § 2458(b)(2). Rather, the purpose of any civil penalties to be awarded here is to penalize Reynolds for its own intentional marketing efforts directed at Vermont consumers – i.e., primarily existing Vermont smokers – which efforts included extensive promotion of the deceptive "less risk" health claims for Eclipse, regardless of the ultimate success (or not) of those marketing and advertising efforts.[15]

---

[14] Although RAI has not booked any potential liability from any particular tobacco litigation case, it has set aside, and carries approximately $2.5 billion in cash each year earmarked to make its share of these payments to the states under the MSA. *See* 2012 Form 10-K, pg. 68 of consolidated balance sheet.

[15] For this reason, the court believes *Anderson v. Johnson & BCK Realty*,2011 VT 17, 189 Vt. 603, is inapplicable here. In that case, the Vermont Supreme Court concluded that a showing of some actual

It seems to be fairly well established, and broadly accepted, that each instance that a deceptive marketing or promotional statement is made, or included in a separately identifiable advertisement in a given issue or edition of a publication, constitutes a separate violation. *See, e.g., May Dept. Stores Co. v. State,* 863 P.2d 967, 974-76 (Colo. 1993); *Commonwealth v. Fall River Motor Sales, Inc.,* 565 N.E.2d 1205, 1213 (Mass. 1991); *State v. Menard, Inc.,* 358 N.W.2d 813, 815 (Wisc. Ct. of Appeals 1984). At least with regard to print media – e.g., magazines and newspapers – that approach is pretty much beyond dispute, under both FTC and state consumer protection law. *Cf., e.g., United States v. Reader's Digest Assn.,* 662 F.2d 955, 959-60, 966-67 ("adopting [Reader Digest's] position that one bulk mailing – no matter how large – comprises only one violation would eviscerate any punitive or deterrent effect of FTC [civil] penalty proceedings").[16]

RJRT does not mount much more than a feeble challenge to the general rule. Instead, Reynolds focuses mostly on its argument that only 6 particular instances of print media use in Vermont of the deceptive Eclipse health claims have been actually proven by the State. As noted above, the court ultimately agrees, even though one could certainly infer circumstantially, given the broad "Final Eclipse Media Plan[s]" for both 2003 and 2004 and the extensive nature of the Eclipse marketing efforts, that the other 16 print exemplars cited by the State probably did arrive within this state as well.

Determining the number of violations committed by RJRT through the Eclipse website is more difficult. This type of "counting" issue appears to have gotten less attention from the courts, even though – as this case demonstrates – the use of internet websites for marketing purposes has been in use for at least 10 years, and has clearly accelerated rapidly in more recent times with dedicated commercial Facebook pages, etc. Without much guidance or obvious precedent, the court concludes that each day's separate availability of the Eclipse website to Vermont consumers is the most logically persuasive approach. A counting rule that recognized the initial creation, and continued existence of a website with deceptive marketing statements as a single violation would be clearly unreasonable and ineffective, and essentially gut the public protection and enforcement policies behind all state consumer fraud laws. *Cf., e.g., Reader's Digest, supra.* But there is no structural underpinning for any particular "bright line" counting

---

harm and injury was necessary for an individual consumer to be awarded relief under the CFA, even just attorney's fees under 9 V.S.A. § 2461(b), where a jury had determined there had been a violation in the making of a false or deceptive statement. *Id.*,¶s 9, 12-13. Here, the State itself has sued RJRT on public protection grounds, seeking civil penalties and prospective injunctive relief. The concept of actual harm to individual consumers does not apply in such situations, because the case has "accomplished some broader 'public purpose,'" *see id.* ¶ 11 (cit. omitted).

[16] This concept, that the deterrent effect of consumer fraud sanctions should be "[something] more than an acceptable cost of [the] violation," *id.* (cit. omitted), was also endorsed almost 40 years ago by the 2nd Circuit Court of Appeals in a case involving another tobacco company now part of RJRT. *See Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1120 (2d Cir. 1975), *cert. denied,* 426 U.S. 911 (1976).

rule beyond that; recognizing that "every day's a new day"[17] in which the deceptive statements can be and are being made to consumers seems to balance the practical means by which consumers utilize such electronic media, and the various economic and marketing incentives (and disincentives) to the perpetrator making the offending promotional statements.

The counting rule for direct mailings also appears to be pretty much beyond dispute: each mailing constitutes a separate violation. *See, e.g., United States v. National Financial Services, Inc.,* 98 F.3d 131, 141 (4th Cir. 1996) (each collection letter was a violation supporting civil penalties under FTC Act); *Commonwealth v. Amcan Enterprises, Inc.,* 712 N.E.2d 1205, 1211 (Mass. Ct. of Appeals 1999). Finally, with regard to the Eclipse package on-serts, there is again no apparent precedent or case-law directly on point, but each such package on-sert was clearly a separate instance of Reynolds intentionally making the deceptive "less risk" health claims in Vermont – either repeatedly to the same consumer(s) in order to constantly reinforce the message, or possibly to other existing Vermont smokers and/or potential consumers (if, for example, the on-sert got passed along, either with an Eclipse cigarette pack, or by itself (e.g., as a recommendation, or just FYI from one smoker to another)).[18]

Accordingly, for all of the reasons stated, the court concludes, and reaffirms that **Reynolds has through 2007 violated the Vermont CFA, and the MSA/Consent Decree, on 6776 separate instances by deliberately making unsubstantiated, and deceptive health marketing claims and statements about Eclipse** which reached, or were available to Vermont consumers,– i.e., on the website (1642 days), the direct mailings (1028 pieces), the package on-serts (4100), and 6 national magazine or newspaper exemplars admittedly received in Vermont.

(B) Assessment of Civil Penalty Amount

As noted, pursuant to the Vermont CFA the court is authorized to assess a civil penalty of up to $10,000 for each violation.  *See* 9 V.S.A. § 2458(b)(1).  The MSA and Consent Decree, however, themselves contain no preset monetary limits, or guidelines, leaving it to the court to ascertain and impose a necessary, appropriate and reasonable sanction for any violation thereof. The court concludes that analysis under the latter should essentially track the determination of civil penalties under the former, *cf.* 9 V.S.A. § 2461(a), and that at least here, there is no compelling need to impose separate

---

[17] *Cf.* "(I Love You) More Today Than Yesterday," *The Spiral Starecase* (Pat Upton) (1969), at https://www.youtube.com/watch?v=YuqHlv1YPe0 .

[18] There is no logical reason, given the overriding public protection policy rationale of these consumer protection statutes, why this latter type of clearly-anticipated (if not hoped-for) consumer conduct should insulate Reynolds from its intentional introduction of deceptive marketing statements into the consumer marketplace. For example, placement of ads in more popular magazines or other publications most likely carries a higher premium precisely because the probability of consumer sharing is higher, meaning "more eyeballs" on the same ad, for an effectively lower *per capita* cost. *Cf. also People ex rel. Lockyer v. R. J. Reynolds Tobacco Co.,* 37 Cal.4th 707, 124 P.3d 408 (2005), *discussed infra* (California statute expressly defined sale or distribution of each pack of cigarettes as a separate violation).

and additional sanctions for violating the MSA and Consent Decree, which sanctions might arguably be deemed duplicative and introduce a whole host of additional legal (if not constitutional) complications.[19] Imposition of civil penalties under the CFA should be legally sufficient to address simultaneously the enforcement and deterrence issues presented by Reynolds' violations of the MSA and Consent Decree. *Cf., e.g., Commonwealth v. Amcan Enterprises, supra,* 712 N.E.2d at 1211. Thus **the outer statutory limit, and absolute maximum for assessment of civil penalties and/or contempt sanctions against RJRT in this case is $67,760,000.**[20]

The parties do not quarrel much about the over-arching framework which is arguably applicable to the assessment of civil penalties under a statutory regime like the Vermont CFA; there is general agreement that a 5-factor analysis should be considered by the court. *See, e.g., Reader's Digest Assn., supra,* 662 F.2d at 967. The dispute, of course, is over the weight to be given each of the factors, and to what degree Reynolds' conduct here supports an adverse inference against it under each of the criteria. The five factors are:

> (1) the good or bad faith of the defendant[ ]; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate benefits derived by a violation; and (5) the necessity of vindicating the authority of the [State].

*Id. See also, e.g., Commonwealth v. Amcan Enterprises, supra,* 712 N.E.2d at 1211; *Commonwealth v. Fall River Motor Sales, supra,* 565 N.E.2d at 1211. Further, "these factors are neither exclusive nor binding . . ." *Id.*

Much of the difference in opinion centers on what the court should now make of its earlier findings, and statements as to the "good faith," or at least absence of "bad faith," on Reynolds' part in developing, and then promoting the Eclipse cigarette. Perhaps it is only a matter of semantics, but the case law, logic, and common sense all seem to point towards the "good faith" factor in the *Reader's Digest* analysis being something of a term of art, whereas the court's prior findings are all principally related to its decision to eliminate the issue of punitive/exemplary damages from this remedy phase of the case. The "good faith" vs. "bad faith" issue in the *Reader's Digest* context appears primarily to involve whether the deceptive marketing violations were

---

[19] This concern is another reason – apart from the court's factual determination that Reynolds and its many agents and employees did not act maliciously or with any "bad intent" to actually harm existing smokers in promoting the Eclipse cigarette – why the court took the issue of punitive and/or exemplary damages off the table as part of the March 2010 liability decision. While the court then found the approach of another federal trial court in a different deceptive marketing case to have some resonance as to why punitive sanctions would not issue against RJRT, *see FTC v. Lane Labs-USA, Inc.*, 2009 WL 2496532 (D.N.J.), that decision was not controlling. Thus the State's recent advice that the District Court's disinclination in that case to find contempt was reversed, *see* 624 F.3d 575 (3rd Cir. 2010), and the court then dutifully did find Lane-labs to be in contempt, see 2011 WL 5828518 (D.N.J.), does not cause this court to change its own judgment about removing <u>additional contempt sanctions</u> from this case.

[20] If limited just to those violations occurring through the package on-serts and direct mailings into Vermont, as to which there is <u>no</u> significant numerical dispute, the maximum limit for statutory civil penalties would be $51,280,000.

committed intentionally and deliberately, or by mistake or inadvertence, and especially whether (a) the deceptive statements are express, non-ambiguous claims, and (b) the violations occurred after the Defendant was already on notice as to the allegedly deceptive nature of the offending advertising statements. This "good faith" question is more correctly deemed an objective, rather than subjective inquiry. *Cf., e.g., Sears, Roebuck & Co. v. FTC,* 676 F.2d 385 (9th Cir. 1982):

> Here the claim is clear, direct, unqualified, and explicit. The more clear and direct the statement, the more likely it is to bring about the intended result, and the larger the number of consumers to be misled. The violation . . . is far more serious in every respect . . . .
>
> [These] advertisements were no accident or "isolated instance." . . . Rather, they were part of an advertising strategy, with attendant slogans, adopted without regard to [the lack of epidemiological studies to support the unqualified "less risk" health claims made for Eclipse]. . . . A selling strategy based on this purchasing fact, e.g., the making of false and unsubstantiated . . . claims . . . would be effective for a considerable period of time, with great benefit to the merchant . . . .

*Id.,* 676 F.2d at 394 (cit. omitted).[21] And, with regard to assessment of simultaneous contempt sanctions, the violations of the Consent Decree and MSA must also have been "willful," but not necessarily malicious or with "bad intent."

The court must also be careful in allowing the State to "bootstrap" its way into a larger penalty just because the State (or any governmental entity with enforcement capability) accuses the advertiser, before suit is brought, of violating the law. Such notices are clearly unilateral and attempt to put the enforcement agency's best spin on its own position, when there may well be substantial issues of fact or law on which the respondent might legitimately rely in defense or at least explanation – although ultimately not successfully, as here. Nonetheless, an official warning shot across the bow is deemed to carry some weight in determining the subsequent "good faith" (or lack thereof) of the advertiser in then proceeding to make the challenged marketing claims. *See, e.g., Reader's Digest, supra,* 662 F.2d at 967 (absence of "good faith" where "the Digest nonetheless proceeded to complete its promotional campaign" after the FTC had explicitly warned it that the marketing devices were deceptive and probably unlawful); *cf., e.g., People ex rel. Lockyer v. R. J. Reynolds Tobacco Co.,* 37 Cal.4th 707, 727, 729, 124 P.3d 408, 420, 421 (2005)(contrary inference where letters from Attorney General

---

[21] To be sure, these comments from *Sears Roebuck* appear in the decision with regard to whether a broad "multi-product" injunction should have been imposed by the FTC, and "the deliberateness and seriousness of the present violation" was one of two factors typically considered as part of that inquiry. *Id.,* 676 F.2d at 392: *see discussion infra.* However, to this court the basic concept under consideration – the objective "good faith" of RJRT in making these deceptive statements concerning Eclipse – is essentially the same.

arguably suggested RJRT would not be in violation of state law, and Reynolds immediately ceased challenged conduct when AG filed suit).[22]

Here the Attorneys General of 40 out of 50 states, acting through the NAAG, told Reynolds in March 2005 in no uncertain terms that its use of the "less risk" health claims for Eclipse without adequate scientific studies to support those statements was a violation of the MSA and each state's consent decree, as well as the consumer fraud laws of many (if not most) of those states. Reynolds persisted, however, and continued to market and sell Eclipse with the challenged statements, since found by this court to be deceptive, for another 2 years. Finally, the explicit provisions of the MSA and resulting Consent Decree(s) which prohibited Reynolds from making any misleading or deceptive marketing claims concerning any tobacco product, were another source of advance notice that it needed to tread very carefully in this area.

As the court discussed at length in the March 2010 liability decision, Reynolds did try to proceed carefully before launching its "less risk" promotional campaign for Eclipse, by engaging in several years of preliminary scientific and medical testing and/or studies, all of which "pointed in the same direction" that a reduced-exposure tobacco product like Eclipse **might** also reduce the ultimate risk of smokers actually incurring smoking-related diseases. The consensus of its own Scientific Advisory Board was essentially the same: only a qualified claim of potential "less risk" consequences could be supported by the then-current state of the scientific and medical evidence, and credible epidemiological studies would have to be performed to support any unqualified, or express "less risk" claims. But at the highest levels of company management, Reynolds already knew that its marketing statements about Eclipse were not "qualified," and that consumers (i.e., existing smokers) understood those claims to be direct, and express statements that smoking Eclipse would in fact lower their risk of developing one of the cited tobacco-related diseases.

Reynolds then acted deliberately and intentionally to pursue an extensive, expensive, multi-pronged, several-year marketing campaign for Eclipse which featured those "less risk" health claims front and center. Thus, although Reynolds did not proceed in "bad faith" or with malice or ill will or "bad intent,"[23] given the totality of all

---

[22] Reynolds obviously seeks comfort in *Lockyer v. RJRT,* where a civil fine of $14,826,200, for giving away free cigarettes (108,155 packs to 14,834 people) in violation of California law, was vacated and sent back to the trial court for further penalty assessment proceedings. The case is in many ways inapposite; the trial court (and court of appeals which had affirmed) thought the words of the statute, and the express formula for calculating the fines, were mandatory, without room for the exercise of any discretion by the trial court. Thus there was no employment of any analysis to determine an appropriate and necessary penalty amount, as here, using (for example) the 5-factor *Reader's Digest* approach. *Id.,* 37 Cal.4th at 727, 124 P.3d at 420. That latter test, of course, does contain "good faith" as one of the criteria, but the weight to be given to each consideration is not prescribed. It is unclear what happened to that California civil penalty against Reynolds, on remand.

[23] Again, none of the of the scientific or medical studies conducted by Reynolds ultimately suggested, let alone proved that smokers would be at any increased risk, or would suffer any different or discrete harm, from smoking Eclipse instead of a traditional cigarette, or even adopting Eclipse as their "regular brand." In the most literal and superficial sense, there is no proof that the Eclipse health claims were in fact false.

19

the attendant circumstances the court must conclude Reynolds also did not, when viewed objectively, act in "good faith" as that term appears to be used in the *Reader's Digest* 5-factor analysis. *Cf., e.g., People ex rel. Lockyer v. R. J. Reynolds Tobacco Co.,* 37 Cal.4th 707, 729, 124 P.3d 408, 422 (2005)(civil statutory fine imposed for "willful" violation "required only an intentional act, not knowledge of the act's illegality, and . . . ignorance of illegality was not a defense").

Turning to the second factor, the "injury to the public," the actual economic impact in Vermont was minimal, i.e., around $12,000 in additional net revenue to RJRT from selling 410 cartons of Eclipse in this state. *Cf., e.g., Commonwealth v. Amcan, supra,* 712 N.E.2d at 1211-12 ($1.47 million in revenue linked to deceptive advertising scheme; civil penalty affirmed at $733,000, or 49.86% of ill-gotten gains, vs. maximum penalty exposure under Mass. statute of $11,725,000, or 6.25%); *Commonwealth v. Fall River Motor Sales, supra,* 565 N.E.2d at 1212 ($126,396 in additional revenue attributed to 3 deceptive ads in the Boston Globe; civil penalty of $20,000 affirmed, at 15.8% of revenue, 66.66% of maximum penalty).[24] As discussed elsewhere, there was no proven injury, or additional harm to existing smokers who might have chosen to either try, or switch to Eclipse, and the State abandoned its claims that the Eclipse marketing campaign might have had broader public impacts by allegedly delaying "reduce or quit" efforts by existing smokers, or even potentially inducing non-smokers to begin the habit.

Nonetheless, as repeatedly emphasized by the State, there was larger, and more diffuse "injury to the public" beyond that inherent in any deceptive marketing blitz. Cigarettes are an inherently dangerous product, which result in avoidable disease and unnecessarily premature deaths even when used "correctly" and for their intended purpose. Their marketing is subject to extensive, and pervasive safety and health regulation, especially in the realm of non-adult smoking. The deliberate and intentional use of these types of unsupported "less risk" health claims to sell cigarettes is especially pernicious, and has repercussions for the public at large well beyond the immediate commercial gain (or, as here, the lack thereof).

The third and fourth factors under *Reader's Digest* appear to be related, in the sense that both ultimately focus the court's attention on the need for effective deterrence, and to set a civil penalty amount that removes the incentive for further violations by eliminating the positive gain (financial, or otherwise) to be derived from the respondent's deceptive marketing efforts. It is of course related also to the "actual injury" component just discussed, if that can be determined in a given case (although as noted "public injury" is broader than just the immediate economic consequences). But "eliminate[ing] the benefits derived by [the] violation," *id.*, 662 F.2d at 967, in this particular case arguably takes on a special meaning apart from how much revenue the actual sales of Eclipse might have generated. Here, as the above-quoted deposition testimony from David Iaucco aptly demonstrates, and as the court described at some length in the liability decision, Reynolds embarked on its Eclipse marketing strategy in

---

[24] The Massachusetts Supreme Judicial Court strongly emphasized the need for deterrence in these deceptive marketing cases, and thus the need to impose a penalty which ignored the perpetrator's claim it was just a single promotional scheme that should be punished only once. *Id.* at 1213, *citing Reader's Digest, supra.*

large part to justify, and possibly even cover (or at least break even on) the expense and effort of developing a potentially reduced exposure product (or "PREP"), which in turn required overcoming consumer resistance and/or unfamiliarity, which in turn appeared to be possible only by making the dramatic "less risk" health claims. And, developing a successful alternative to the traditional tobacco-burning cigarette was then, and clearly remains a paramount goal for Reynolds, if not a matter of ultimate company survival. *Cf.* ¶ 21, *supra*. In this sense, the developmental and marketing costs for Eclipse – the former was never established at the liability trial, or more recently during the remedy phase – are the real "benefits derived by [the] violation" and which the court should look to address in assessing a necessary, and adequate civil penalty amount.

Finally, the need to vindicate the "enforcement" authority, and public protection role of the State is the last factor to be considered. The outer contours of the civil penalty amount imposed by the court must obviously be limited to what Vermont law allows, and be premised primarily on the unlawful impact of the deceptive marketing on Vermont consumers. But the reality, and larger context of this suit, and extensive multi-year marketing program for Eclipse cannot be wholly ignored. The Eclipse "roll-out" beginning in 2003 was intentionally nationwide, and the extensive marketing strategy developed, and implemented by Reynolds had nationwide scope and national impacts. It is fair to assume that, for whatever reason(s), 39 of the 40 other state Attorneys General who signed the March 2005 warning letter allowed Vermont to bring, and pursue this single "test case" over Eclipse and the "less risk" health claims made by Reynolds. This would not be the first time that Reynolds itself has recognized that enforcement litigation in a single state can have spill-over consequences that effectively limit its business options and methods nationwide. *See* ¶ 15 and fn. 11 *supra*.

The outer limit, and maximum amount here of the civil penalty the court may assess against Reynolds, under 9 V.S.A. § 2458(b)(1), is $67.76 million. Within that outer boundary, the court then has some freedom – i.e., judicial discretion, *see Reader's Digest, supra,* 662 F.2d at 967; *Commonwealth v. Amcan, supra,* 712 N.E.2d at 1211 – to fashion a civil penalty response which is arguably tailored to and addresses the reality of the conduct actually engaged in by Reynolds. The court is mostly concerned with, and primarily considers some approach which will substantially remove or reduce the benefits which Reynolds accrued by pursuing the extensive Eclipse development and marketing campaign with the unsupported "less risk" health claims; the amount of any civil penalty which will actually create any such deterrence, as well as nominal punitive effect on an entity the size of Reynolds, must indeed be substantial itself. Secondarily, the court is also concerned with vindicating the public protection and enforcement prerogatives of the State, under both the Vermont CFA and the MSA and Consent Decree; even though nominally limited to Reynolds' violations in Vermont, to address those violations and this State's role in any meaningful way again requires a substantial monetary response that cannot be numerically limited just by the relatively small number of Vermont consumers or the net revenue generated here.

Finally, RJRT's lack of objective "good faith," as discussed above – and its concurrent  lack of "bad intent" as well as its co-occurring affirmative reasons for selling Eclipse in the manner it deliberately chose – play only a very small part in the court's

ultimate assessment of the appropriate amount of the civil penalty. Likewise, the court places little emphasis on Reynolds' prior "wrongdoing" and the fact that it has been involved for many years in numerous other enforcement and civil penalty cases against it (and the other national tobacco companies), the most important of which is the federal RICO action which has finally culminated in an extensive injunction and remedial order against Reynolds (and the others), *see infra*. Finally, the fact the court ultimately found "only three" of the challenged Eclipse claims to be deceptive is of little solace to Reynolds; the three "less risk" statements found to be misleading and unsupported by the necessary medical evidence were the core of the extensive Eclipse marketing campaign.

The court declines to fashion a civil penalty using some arbitrary "per violation" number. Instead, the court will ground the penalty amount in the real world of what Reynolds actually did in its efforts to promote and market Eclipse deliberately using deceptive "less risk" health claims. It spent $16.656 million on advertising and other marketing and promotional expenses for Eclipse, just through 2004 when it stopped using the "Scott ad" (although it continued with other uses of the same or similar "less risk" health statements, and did not stop selling Eclipse until 2007). Recouping 50% of that amount, in effect forcing Reynolds to take a charge-back of $8.328 million against its own marketing expense for Eclipse, is a rational response that is directly related to the deceptive conduct Reynolds engaged in. That amount recognizes some rough equivalency for the "mixed-motive" nature of RJRT's actions, and is certainly well less than what might arguably be appropriate – e.g., one could persuasively argue that dollars spent in 2000-2004 should be adjusted upward for inflation and the value of that same amount of money today, and one could also argue that RJRT's known marketing costs from 2000-2004 do not reflect the total amount spent on selling Eclipse for the entire period, from inception through 2007. **The civil penalty to be assessed against R. J. Reynolds Tobacco Co., pursuant to 9 V.S.A. § 2458(b)(1), shall be $8,328,000.**

The court has few illusions that even this amount, at $8.328 million, will likely have any <u>real</u> deterrent effect on Reynolds, although that is the court's principal rationale. Given the reality of the huge numbers Reynolds must deal with day-to-day, and year-to-year in connection with all tobacco-related litigation, enforcement, and regulatory matters – e.g., setting aside <u>roughly $2.5 billion every year</u> for its share of the MSA payments to the states; or the $938 million in disputed adjustments for 2011 and 2012 alone vis-à-vis non-participating tobacco manufacturers; or RJRT's share of the $125.8 million just in punitive damages already assessed (and under review or on appeal) in Florida tobacco-related cases alone – the $8.328 million civil penalty imposed here will likely be pocket change, and not really large enough by itself to influence Reynolds' future behavior from a strictly monetary standpoint.[25] This penalty amount is a fraction (maybe 12-15%) of the average amounts RAI now spends on either research and development, or advertising and marketing, for all of its tobacco products.

[25] Reynolds argues that what it has spent on its own attorney's fees and litigation expense – an amount it steadfastly refuses to disclose – and what it will likely have to pay to the State for its attorney's fees and costs, should be taken into consideration as well. The amount of the latter is premature; the contention itself is legally irrelevant. *Cf., e.g., Commonwealth v. Fall River Motor Sales, supra,* 565 N.E.2d at 1214.

However, to impose any lesser amount would have even less impact or effect, and would be an abdication of the court's responsibility to fashion a meaningful penalty response that is consistent with the actual facts of the case, and directly addresses the deceptive marketing conduct that Reynolds actually engaged in. The court does remain hopeful that this civil penalty amount, in connection with the court's March 2010 liability findings and analysis, are together substantial, serious, and significant enough to influence RJRT's conduct going forward when it inevitably attempts to develop, and market the next generation of allegedly reduced-risk tobacco products.

(C) <u>Reynolds' Constitutional Claims</u>

Having determined that $8.328 million is the appropriate, and minimally necessary civil penalty to assess against Reynolds, the court must next consider RJRT's arguments that such an amount is disproportionate, even to the extent of being unconstitutional under the Due Process clause and/or 8th Amendment (i.e., "excessive fines" clause) to the United States constitution, and any equivalent limitations under the Vermont constitution stated in Chap. II, § 39, *see State v. Venman,* 151 Vt. 561, 572-74 (1989); *State v. Bacon,* 167 Vt. 88, 96-98 (1997). The sanction to be imposed is 12.3% of the maximum civil penalty that might have been theoretically assessed against Reynolds under the CFA statute; as noted, it is essentially 50% of the actual dollars RJRT spent on marketing Eclipse just from 2000-2004, unadjusted for the inflationary value of the same amount of money today, or for the total of all marketing expenses incurred for Eclipse through 2007 (when all sales finally ended). The $8.328 million civil penalty is 0.362% of Reynold's adjusted operating income ($2.3 billion) for 2012, and 0.655% of the parent holding company's (RAI's) net income of $1.272 billion in 2012.

The court's admittedly discretionary assessment of statutory damages and/or civil penalty amounts, which are cabined by the Legislature's own determination of both the allowable range and the upper maximum, are generally thought <u>not</u> to present the same constitutional issues raised by jury assessments of punitive damages. By definition, advance notice of the violator's maximum monetary exposure is provided by the statute itself, and any arguable "disparity between 'actual harm' and an award of statutory damages" is immaterial because such awards "are designed precisely for instances where actual harm is difficult or impossible to calculate," *see Capitol Records v. Thomas-Rasset,* F.3d (8th Cir. 2012), and imposing <u>some</u> punitive as well as deterrent effect is the very purpose of the statutory civil penalty. *See also, e.g., Sony BMG Music Entertainment v. Tennebaum,* 660 F.2d 487, 513 (1st Cir. 2011); *Verizon California, Inc. v. Onlinenic, Inc.,* 2009 WL 2706393, at 7-8 (N.D. Cal. 2009); *United States ex re. Tyson v. Amerigroup Illinois, Inc.,* 488 F.Supp.2d 719, 748 (N.D. Ill. 2007); *People ex rel. Lockyer v. Fremont Life Ins. Co.,* 104 Cal.App.4th 508, 521-22 (2002).

With respect to the "proportionality" argument, *see Venman, supra; cf. Lockyer v. R. J. Reynolds, supra,* 37 Cal.4th at 728-730, 124 P.3d at 421-423,[26] Reynold's

---

[26] *Lockyer v. R. J. Reynolds* states that any imposition of a civil penalty pursuant to statute is subject to constitutional limitations, both state and federal, barring "excessive fines" and as a possible "due process" violation. *Id.* "It makes no difference whether the court examine[s] the issue as an excessive fine or a

contention that the civil penalty in this case is somehow limited by the civil penalties imposed in other Vermont cases (often, if not primarily by consent decree, rather than after plenary trial, as here), or by the treble damages limitation when a consumer pursues a private cause of action, *see* 9 V.S.A. § 2461(b), or by the criminal fine limitation of $1000 in a superficially analogous statute criminalizing "false advertising," *see* 13 V.S.A. § 2005, is not persuasive. If the Vermont Legislature had intended to limit the range of allowable civil penalties under 9 V.S.A. § 2458(b)(1) to only $1000, instead of $10,000, it could have explicitly said so.

Further, no actual evidence has been presented to support Reynold's general contention that a civil penalty range of $0 - $10,000 per violation is somehow "grossly disproportionate" to the gravity of, and public harm caused by each such instance of deceptive marketing. *See Bacon, supra,* 167 Vt. at 96 & fn. 7 ("the overriding consideration in proportionality claims is the comparison of the [violation] committed and the [penalty] imposed . . . only where this threshold comparison 'leads to an inference of gross disproportionality' should a court engage" in any further comparative analysis). This court refuses to speculate why the Legislature may have chosen to leave the crime of "false advertising," originally enacted in 1947 , or possibly even 1931 – well before more modern, and current approaches to false advertising regulation have shifted to these types of civil consumer fraud enforcement actions – as a misdemeanor subject to a maximum fine of $1000.

The "proportionality" principle in this context is typically said to include consideration of four criteria in order to determine whether a given fine, or statutory civil penalty is reasonable and therefore constitutionally valid: "(1) the Defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the Defendant's ability to pay." *Lockyer v. R. J. Reynolds, supra,* 37 Cal.4th at 728, 124 P.3d at 421, *citing United States v. Bajakajian,* 524 U.S. 321, 337-38, 118 S.Ct. 2028 (1998). But this is essentially the same test, with essentially the same factors, which the court has already applied under *Reader's Digest* in determining the minimally necessary, and appropriate penalty to assess against Reynolds. There is no apparent reason why the court must duplicate that effort, and repeat it all over again.

Other arguments advanced by RJRT to ward off a substantial civil penalty are also not persuasive. The remedies available to a defrauded consumer under § 2461(b) serve a much different purpose than the overriding public protection goals which underlie the deterrent and enforcement penalties allowed to the State under § 2458(b) of the CFA, which in any event provides for recoupment of individual consumer restitution in addition to the maximum penalty of $10,000 per violation. Finally, comparisons to what other CFA violators have been required to pay as a civil penalty are

---

violation of due process"; the "proportionality" test, *see infra*, is the applicable lens through which to examine each. *Id*.

unhelpful, given the small sample size in Vermont,[27] *cf. Bacon, supra,* 167 Vt. at 98, and the general conclusion that such comparisons are legally immaterial.[28]

Where Reynolds has committed multiple violations which were intentional, deliberate and substantially deceptive; in a commercial and marketing arena where public protection and concerns about misleading health claims are already paramount; and the civil penalty amount assessed by the court is still nonetheless significantly reduced from the maximum allowable and less than 1% of the company's operating and/or net income, the sanction assessed is proportionate to the actual conduct and an amount necessary to get Reynolds' attention for deterrence purposes. *Cf., e.g., State v. Venman, supra,* 151 Vt. at 573-74 (cit. omitted) (maximum penalty significantly enhanced due to multiple number of offenses)*; Korangy v. FDA,* 498 F.3d 272, 278 (4th Cir. 2007); *Lockyer v. R. J. Reynolds, supra,* 37 Cal.4th at 730, 124 P.3d at 422 ("lack of good faith . . . support[s] imposition of a large fine" where advertiser "failed to cease its unlawful conduct when notified" and/or "continued to sell" with "deceptive" marketing claims)(cits. omitted). There is no apparent reason which compels the court to reduce the civil penalty of $8.328 million.

### (D) Permanent Injunctive Relief

The State also seeks broad injunctive relief against Reynolds to address its violations of the CFA, MSA and Consent Decree, and to prohibit RJRT from engaging in any future conduct of a similar nature with respect to not only Eclipse and other "potentially reduced-exposure products" ("PREPs"), but also all tobacco and tobacco-related products generally. However, the parties (and the court) agree that the jurisdictional limits of any such injunction must confine its scope, and application to Reynolds' conduct within the state of Vermont. Injunctive relief is clearly authorized under the CFA, *see* 9 V.S.A. § 2458(a), (b), and the express terms of both the MSA and Consent Decree anticipate the issuance of restraining and/or enforcement orders to address any proven violations. *See* MSA, § VII(c)(3); Consent Decree, ¶ VI(A).

Reynolds' first argument against issuance of any injunctive relief is that the need for any restraining and/or enforcement orders has gone away because it is no longer selling Eclipse, or any other tobacco PREPs – indeed, it stopped selling Eclipse in 2007

---

[27] Reynolds points, for example, to the Final Order in *State v. CSA-Credit Solutions of America, LLC,* Dkt. # 484-7-10 Wncv (March 21,2012), in which the court imposed a civil penalty of "only" $2.07 million under 9 V.S.A. § 2458(b)(1), in addition to consumer restitution and reimbursement for investigation and litigation costs ($91,059.50). There is little context, however, to evaluate the size of the civil penalty in that case against the details of the CFA violation(s) actually found to have been committed. Other than the fact that $2.07 million is less than the $8.328 million penalty to be imposed here, it is difficult to understand how *CSA-Credit Solutions* supports any "proportionality rule" which is helpful here.

[28] *See Bacon, supra,* 167 Vt. at 96 & fn. 7. *See also, e.g., United States v. Emerson,* 107 F.3d 77, 81 & fn. 9 (1st Cir. 1997): "[T]he proportionality concern in an excessive fines case is generally considered to be a question of whether the fine imposed is disproportionate to the [violation] committed, not whether a given fine is disproportionate to other fines imposed on other defendants. Although review of penalties in similar cases may be instructive in evaluating the range of penalties appropriate for a given [violation], . . . it [is] of limited assistance in judging whether a given fine exceeds constitutional bounds."

– and is not making any similar health-related comparative marketing claims in any of its current advertising or promotional campaigns for any of its products. The short answer here is that "the fact that illegal conduct has ceased does not foreclose injunctive relief" where there is the ability to commit the same or similar infractions in the future, absent a permanent restraining order. *See FTC v. National Urological Group,* 645 F.Supp.2d 1167, 1209 (N.D. Ga. 2008), *aff'd,* 356 Fed.Appx. 358 (11th Cir. 2009), *reh'g en banc denied*, 401 Fed.Appx. 522, *cert. denied,* 131 S.Ct. 505 (2010) (cits. omitted); *cf. All Cycle, Inc. v. Chittenden Solid Waste District,* 164 Vt. 428, 432-33 (1995) ("voluntary cessation of . . . illegal conduct does not moot a case")(cit. omitted). *See also, e.g., FTC v. Accusearch, Inc.,* 570 F.3d 1187, 1202 (10th Cir. 2009) (injunction warranted where defendant continues to conduct same general business and has "capacity" to engage in similar acts or practices in the future). Where the necessary prerequisites are established – i.e., numerous, and serious instances of deceptive marketing, and the ability to engage in the same or similar conduct going forward – then the respondent bears the "heavy burden of showing there is no reasonable expectation that [the] wrong will be repeated." *All Cycle, supra,* 164 Vt. at 433; *see also, e.g., FTC v. Direct Marketing Concepts, Inc.,* 648 F.Supp.2d 202, 212 (D. Mass. 2009).

In determining whether there is a "cognizable danger of future violations," the court may look to such indicators as the nature of the violations already committed, whether the Defendant's business gives it the ability (if not some incentive) to commit future violations, and the possible harm to consumers if the same deceptive marketing practices are committed again. *See National Urological Group, supra,* 645 F.Supp.2d at 1209 (cit. omitted). The court's remarks on these points in *National Urological Group,* where a broad permanent injunction against future violations was entered by the court, are instructive:

> The evidence clearly demonstrates that the corporate [D]efendant['s] . . . violations . . . were numerous and grave. [Respondent] did not engage in a harmless advertising scheme with an isolated incidence of deception; instead, their advertising scheme was chock-full of false, misleading, and unsubstantiated information. This deceptive propaganda was not simply distributed through magazine advertisements and other general circulation media that could be easily "tuned out" by consumers; rather it was also sent directly to pre-determined lists of individuals who were especially vulnerable to such targeted advertisement[s]. In short, the [Defendant] dispensed deception to those with the greatest need to believe it . . .

i.e., existing smokers with a nicotine habit presumably craving some way to lessen their risk of contracting cancer or other debilitating diseases because they are unable to quit. *Id.,* 645 F.Supp.2d at 1209. The court again emphasized that the respondent's "current business endeavors" and essential business model "could serve as a platform for continuing violations" and further deceptive statements of a similar nature. *Id.,* at 1209-1210. Finally, the court emphasized that, beyond any financial injury to consumers (or

26

gain by the defendant), "[m]ore concerning is the physical harm that these types of deceptive claims could foreseeably inflict on consumer's health." *Id.,* at 1210.[29]

Second, Reynolds argues that the prior Consent Decree in this case, and the broad 18-page injunction order against it arising out of the federal government's anti-racketeering ("RICO") lawsuit brought against all of the tobacco companies – *see United States v. Phillip Morris USA, Inc., et al.,* 449 F.Supp.2d 1 (D.D.C. 2006)(initial liability findings and remedial order), *aff'd in part & rev'd in part,* 566 F.3d 1095 (D.C. Cir. 2009)(liability upheld; injunction remanded), *cert. denied,* 130 S.Ct. 3501 (2010); *United States v. Phillip Morris USA, Inc., et al.,* 787 F.Supp.2d 68 (D.D.C. 2011)(revised injunction order, effective through September 1, 2021), *aff'd,* 626 F.3d 832 (D.C. Cir. 2012), *see* fn. 35 *infra* – makes any injunction order from this court unnecessary and duplicative. The short answer to the first point is that the MSA, and the existing Consent Decree(s) obviously did not have the full deterrent effect against deceptive marketing that was expected. *See id.,* 566 F.3d at 1134 (the D.C. Circuit endorsed the trial court's finding that "despite the MSA [the tobacco companies] still fraudulently . . . marketed 'low tar' cigarettes as a healthier alternative to quitting").

Next, while there may be some overlap in the practical effect on Reynolds' business operations going forward because of multiple injunctions, that is the inevitable result of Reynolds having violated the laws of multiple jurisdictions, and having been found in violation of this court's own 1998 order and Consent Decree, with each entity then having independent enforcement authority which needs to be properly recognized. In any event, the injunction this court will enter as a result of this case will arguably be more narrow, and hopefully more focused than the broad injunctive relief finally granted by the federal court in the civil RICO case,[30] and thus not identical or superfluous. *Cf., e.g., National Urological Group, supra,* 645 F.Supp.2d at 1210. However, to that extent the court <u>does</u> take into consideration the other injunction order(s) to which RJRT is now subject, in fashioning the appropriate, and minimally necessary injunctive relief to be awarded here.

---

[29] Again, the court acknowledges that the State abandoned any effort to prove that existing smokers were <u>actually</u> deterred from quitting, or reducing the number of cigarettes smoked, because of Reynold's deceptive Eclipse marketing. However, in considering the need for injunctive relief against repeating the same sort of marketing efforts, commonly understood patterns of human behavior, indeed essential human nature, need not be ignored entirely, especially where it is undisputed that smoking is not only psychologically but physiologically addictive; commonly accepted that addicts will utilize any available means, and any handy rationalization, to continue their habit; and previously discussed in this case that Eclipse smokers were likely to change their smoking patterns, and likely to exceed the laboratory measurements of smoke intoxicants obtained by Reynolds, in order to maintain their needed levels of nicotine intake. *Cf. id.,* at 1210 (it is "easy to imagine that a consumer, relying upon false and unsubstantiated advertising about . . . safety, efficacy, and ability to conquer health threatening circumstances, could forego a much needed medical" alternative).

[30] The "Final Judgment and Remedial Order" entered in the federal RICO case, along with the negative proscriptions on conduct which might be expected, *see infra* fn. 35, also includes numerous and substantial <u>affirmative</u> obligations which Reynolds, along with all of the other tobacco companies, must carry out over the next decade. *See United States v. Phillip Morris USA, Inc., et al., supra;* Exhibit RJR-2004. This court's order will not impose any affirmative, or pro-active obligations on RJRT.

Third, the advent of regulatory authority given to the FDA to address these types of tobacco product development, manufacturing, and marketing issues[31] does not pre-empt this court from exercising its own enforcement authority as granted by 9 V.S.A. § 2458(a), (b), and as a sanction for Reynolds' violation of this court's prior Consent Decree. *See* "Family Smoking Prevention and Tobacco Control Act," Pub. L. No. 111-31, 123 U.S. Stat. 1776 (June 22, 2009), *codified at* 21 U.S.C. § 387 *et seq.* Congress expressly provided that "[n]othing" in the Tobacco Control Act "shall be construed to . . . affect any action pending in [any] Federal, State, or tribal court." *Id.,* § 4(a), 123 U.S. Stat. at 1782. <u>If</u>, at some future time the FDA promulgates and begins to actually implement and enforce regulations regarding the development, production and sale of tobacco PREPs[32] – presumably after extensive consideration of even more in-depth, and more recent scientific evidence than that reviewed by this court, by multiple experts certainly more capable and cognizant than this court of the myriad health and medical issues presented – which materially conflict with the injunction to be issued here, there should be no doubt the court will consider at that point any necessary revisions to reflect, and recognize the FDA's superior regulatory authority.

The case law generally supports the State's contention that an "all products," or "fencing in" injunction would be entirely permissible given the nature of the substantial violations deliberately committed by Reynolds, and the transferability of such marketing techniques to any other tobacco and/or tobacco-related products which it presently manufactures and sells, or might choose to develop and sell in the future. *See, e.g., Sears, Roebuck & Co. v. FTC, supra,* 676 F.2d at 394 ("A selling strategy based on . . . the making of false and unsubstantiated . . . claims . . . could be readily transferred to the marketing of other [products] in the [same] category");[33] *Kraft, Inc. v. FTC,* 970 F.2d 311, 326-27 (7th Cir. 1992); *cf. United States v. Phillip Morris USA, Inc., et al., supra,* 787 F.Supp.2d at 74 (broad federal injunction involving <u>all</u> cigarette products, *see* fn. 35 *infra*).[34]

---

[31] The 2009 Tobacco Control Act provides in pertinent part that sale of any "modified risk tobacco product" is prohibited <u>unless</u> the FDA concludes the product "will significantly reduce[ ] harm and risk of tobacco-related disease to individual tobacco users" and "benefit the health of the population as a whole . . . ." *Id., codified at* 21 U.S.C. § 387k(g)(1).

[32] The FDA's consideration of its general scientific and medical approach to these issues – i.e., the tobacco industry's development of tobacco PREPs and what "less risk" claims, <u>if any</u>, can be validly made in marketing those products – as well as the promulgation of its own regulations, have all been substantially delayed by the industry's (including Reynolds) various challenges to all, or parts of the 2009 Tobacco Control Act. *See, e.g., Discount Tobacco City & Lottery, Inc. v. United States,* 678 F.Supp.2d 512 (W.D. Ky. 2009), *aff'd in part & rev'd in part,* 674 F.3d 509 (6th Cir. 2012), *cert. denied sub nom. American Snuff Co. et al. v. United States,* _ U.S. _ , _ S.Ct. _ (No. 12-521)(Apr. 22, 2013).

[33] The Ninth Circuit also stated: "Extensive and substantial violations justifying a multi-product order may include a nationwide, long-term, multi-million dollar false advertising campaign relating to a single widely used, high-cost product . . . ." *Id.,* 676 F.2d at 394 (cit. omitted).

[34] In the RICO case the U.S. District Court stated, in justifying the need for an extensive "fencing in" injunction: "[A]s long as [the tobacco companies] are in the business of selling and marketing tobacco

Certainly Reynolds has made it clear, in its most recent filings with and statements to the Securities & Exchange Commission, *see* ¶ 21 *supra,* that the further development and marketing of tobacco PREPs in some form is key to the company's long-term commercial interests. Given that intense, and continuing interest in this area by Reynolds, it would be remiss of this court not to issue some sort of injunctive relief to the State, as yet another means to deter RJRT from engaging in the same types of deceptive marketing techniques as has already occurred with the Eclipse cigarette. However, the court is constrained by the reality that Vermont is a small state with limited resources, both judicial and otherwise, and it would be inefficient, and arguably presumptuous, for this court to claim on-going jurisdiction (and the necessary monitoring and enforcement authority) over the marketing of all tobacco products created or sold by Reynolds, when both the FDA and the United States Department of Justice now have the tools, and the superior resources and expertise, to fulfill that role.[35]

Accordingly, the court will enter the following permanent injunction against Defendant R. J. Reynolds Tobacco Co.:[36]

---

products, they will have countless 'opportunities' and temptations to take similar unlawful actions in order to maximize their revenues, just as they have done for the past five decades." *Id.*

[35] In particular, the Final Judgment and Remedial Order of the federal court in the RICO case imposes the following injunction against Reynolds (and the other tobacco company defendants):

> 3. All Defendants . . . are permanently enjoined from making, or causing to be made in any way, any material false, misleading or deceptive statement or representation . . . that misrepresents or suppresses information concerning cigarettes. Such material statements include, but a re not limited to, any matter that (a) involves health, safety, or other areas with which a reasonable consumer or potential consumer of cigarettes would be concerned; (b) a reasonable consumer or potential consumer would attach importance to in determining whether to purchase or smoke cigarettes; or (c) the Defendant . . . making the representation knows or has reason to know that its recipient regards or is likely to regard as important in determining whether to purchase cigarettes or to smoke cigarettes, even if a reasonable person would not so regard it.

> 4. All Defendants . . . are permanently enjoined from conveying any express or implied health message or health descriptor for any cigarette brand either in the brand name or on any packaging, advertising or other promotional, informational or other material. Forbidden health descriptors include the words "low tar," "light," "ultra-light," "mild," "natural," and any other words which reasonably could be expected to result in a consumer believing that smoking the cigarette brand using that descriptor may result in a lower risk of disease or be less hazardous to health than smoking other brands of cigarettes. Defendants are also prohibited from representing directly, indirectly, or by implication, in advertising, promotional, informational, or other material, public statements or by any other means, that low-tar, light, ultra-light, mild, natural, or low-nicotine cigarettes may result in a lower risk of disease or are less hazardous to health than other brands of cigarettes.

*See United States v. Phillip Morris USA, Inc., et al., supra;* Exhibit RJR-2004.

[36] The court certainly understands that the development and marketing of so-called "smokeless tobacco" products – i.e., snus, or snuff – is the next big frontier, and marketing opportunity for RJRT and all of its competitors, at least in the United States. *See, e.g.,* ¶s 20-21 *supra.* Nonetheless, the court stands by its decision, for all of the jurisprudential reasons already cited, to issue the minimally necessary injunctive relief which corresponds only to the specific conduct, and the discrete corporate entity, which were

29

Defendant R. J. Reynolds Tobacco Co. is hereby permanently enjoined, and prohibited from

(A) marketing, distributing, selling, promoting or advertising – within the state of Vermont or in any manner which would reasonably be expected to reach consumers or potential customers in the state of Vermont – any non-traditional cigarette, or "potentially reduced exposure product" ("PREP"), which contains actual tobacco as a constituent component or ingredient in any amount, whether the tobacco is burned, heated or otherwise subjected to any process intended to release the tobacco's own constituent elements (including, but not limited to nicotine (or any chemical variant(s) thereof));

(B) through the use of, together with, or accompanied by any marketing claims, or advertising or promotional statements which suggest, state or allow any inference by a reasonable existing cigarette smoker, that the purchase and use of the PREP or non-traditional cigarette will lessen, or reduce the purchaser's medical risk, or chances of developing (or contracting) cancer, chronic bronchitis, or emphysema, <u>unless</u>

(C) Reynolds can cite to (1) at least one long-term epidemiological study of existing smokers using the same (or an essentially similar) PREP and/or non-traditional cigarette, published in an accredited scientific or medical journal of general circulation, which clearly and unequivocally supports the claim(s) or statement(s) made under sub-part (B) above; or (2) multiple studies of existing smokers using the same (or an essentially similar) PREP and/or non-traditional cigarette, each published in an accredited scientific or medical journal of general circulation, which studies document a statistically <u>and</u> medically significant decrease in the presence, or incidence of validated biomarkers for the development of cancer, chronic bronchitis, or emphysema as a result of the use of the PREP and/or non-traditional cigarette, where (i) the existing smokers' use of the PREP and/or non-traditional cigarette in each study accurately and substantially replicates the smokers' regular patterns of smoking and in particular the smokers' regular level of nicotine intake, and (ii) the "validated biomarkers" are recognized and accepted as such for the development of cancer, chronic bronchitis, or emphysema by a broad community of scientists and medical experts familiar with tobacco-related diseases.

---

actually put on trial in this case, and found to be in violation of the CFA, and the MSA and Consent Decree.

## III. **FINAL ORDER**

A final judgment shall be entered in favor of the State of Vermont, adjudging Defendant R. J. Reynolds Tobacco Co. to be liable to the State under 9 V.S.A. § 2458(b)(1), and as a sanction for violation of the Master Settlement Agreement and the 1998 Consent Decree previously entered by this court, requiring the payment of a civil penalty to the State in the total amount of $8.328 million.

A permanent injunction shall be entered in favor of the State of Vermont and against Defendant R. J. Reynolds Tobacco Co., pursuant to 9 V.S.A. § 2458(a), (b), and to address and remedy Defendant's violation of the Master Settlement Agreement and the 1998 Consent Decree previously entered by this court, as set forth immediately above.

Any application by the State of Vermont for an award of attorney's fees and/or other investigative or litigation costs and expenses, under 9 V.S.A. § 2458(b)(3) or as may be allowed under the Master Settlement Agreement and the 1998 Consent Decree previously entered by this court, shall be served, and filed as required by VRCP 54(d)(2), or within such further time and under such circumstances as the court shall direct, by stipulation of the parties or otherwise.

IT IS SO ORDERED, at Burlington, Vermont, this _3rd _ day of June, 2013.

____/s/ Dennis R. Pearson_____
Dennis R. Pearson, Superior Judge